**Diana K. POWELL, Petitioner,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION,
Respondent,**

**D. C. Transit System, Inc., Intervenor.**

**No. 21750.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 23, 1970.

Decided June 28, 1973.

Diana K. Powell, pro se.

Douglas N. Schneider, Jr., Gen. Counsel, Washington Metropolitan Area Transit Commission, Washington, D. C., for respondent.

Harvey M. Spear, New York City, for intervenor.

Before ROBINSON and MacKINNON, Circuit Judges, and DAVIS,* Judge, United States Court of Claims.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This petition is one of two [1] bringing under review an order promulgated by the Washington Metropolitan Area Transit Commission in a proceeding initiated by D.C. Transit System, Inc. (Transit) for authority to increase its fares for public transportation by bus in the District of Columbia and its suburbs. That order, No. 773, granted increases, but in amounts lower than those sought; [2] others, Nos. 781 and 781a, denied reconsideration of the earlier order.[3] After examination of the admin-

---

\* Sitting by designation pursuant to 28 U.S. C. § 293(a) (1970).

1. The other is presented in Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. ——, 485 F.2d 786, decided today.

2. D.C. Transit Sys., Inc. (Order No. 773), 72 P.U.R.3d 113 (1968).

3. D.C.Transit Sys., Inc. (Order No. 781) (WMATC Feb. 26, 1968) (unreported); D.C. Transit Sys., Inc. Order No. 781a), 74 P.U.R.3d 178 (1968). The first of these two orders announced the denial of the petitions for reconsideration, and the second discussed the Commission's reasons therefor.

istrative record in light of petitioner's several contentions, we conclude that the Commission's action, to the extent that it is properly before us for review herein, was well within its regulatory domain. We accordingly affirm Order No. 773 in the aspects reviewed in this opinion.

On September 1, 1967, Transit filed with the Commission new tariffs contemplating a number of changes in its fare schedules.[4] On September 15, the Commission announced that public hearings would be held on Transit's application,[5] and on September 29, suspended operation of the proposed fares pending completion of the proceeding thereon.[6] After extensive investigation,[7] the Commission, on January 26, 1968, issued Order No. 773 granting Transit a partial increase.[8]

In that order, the Commission found that Transit's existing fares were "unjust and unreasonable"[9] because they would "not produce sufficient revenues to enable the carrier to meet its operating expenses and earn a reasonable return."[10] The Commission further found that the fares sought by Transit were "unjust and unreasonable in that they would produce net operating revenues in

4. See also note 5, *infra*. The procedures by which changes in fares may be achieved are specified in the Franchise Act § 5, 70 Stat. 598, 599 (1956), and in the Washington Metropolitan Area Transit Regulation Compact (Compact), tit. II, art. XII, §§ 5, 6, 74 Stat. 1031 (1960), as amended, 74 Stat. 765 (1962), and set forth following D.C.Code §§ 1–1410, 1–1410a (1967). See also D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 151 U.S.App.D.C. 223, 225, 466 F.2d 394, 396–397, cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972). The most prominent changes Transit sought were increases in the basic District of Columbia fares to 30 cents cash and four tokens for $1.10.

5. D.C. Transit Sys., Inc. (Order No. 735), (WMATC Sept. 15, 1967) (unreported). Transit originally sought fare increases in early June, 1967, which closely followed upon March 15, 1967, fare increases. See D.C. Transit Sys., Inc. (Order No. 684) (WMATC March 13, 1967) (unreported), aff'd, Payne v. Washington Metropolitan Area Transit Comm'n, 134 U.S.App.D.C. 321, 415 F.2d 901 (1968). Operating results under the March 15 fares were thus available for only two and one-half months, a period the Commission deemed too limited a basis for a reliable assessment of Transit's experience with those fares. The Commission accordingly required Transit to supplement the record with evidence of experience over a more extended period. D.C. Transit Sys., Inc. (Order No. 773), *supra* note 2, 72 P.U.R.3d at 121. When the hearings on the September 1 filing opened on October 12, 1967, Transit provided the Commission with statistical data reflecting its revenues and expenses for the preceding twelve-month historical period, the greater portion of which followed inauguration of the March 15 fares. D.C. Transit Sys., Inc. (Order No. 684), *supra*, at 46–47. An evaluation of the evidence relating to experience since March 15 revealed that the Commission had set fares at a level which, in harmony with the Commission's predictions, generated revenues of $36 million and, after all obligations were met, a return of about $600,000. *Id.* at 30.

On May 26, 1967, prior to the refiled fare-increase application, Transit sought authority to use reconditioned buses in lieu of new bus purchases required by previous order of the Commission. D.C. Transit Sys., Inc. (Order No. 362) (WMATC May 27, 1964) (unreported). The earlier application was consolidated with the fare-increase application. D.C. Transit Sys., Inc. (Order No. 741) (WMATC Sept. 29, 1967) (unreported). See text *infra* at notes 21–22.

6. D.C. Transit Sys., Inc. (Order No. 739), (WMATC Sept. 29, 1967) (unreported).

7. The Commission held fifteen sessions of public hearings to which five formal party-protestants, including petitioner, were admitted as participants. A total of 111 exhibits were introduced, and the transcript aggregates 2,716 pages. The Commission also processed 85 formal petitions, protests and letters in connection with Transit's application.

8. D.C. Transit Sys., Inc. (Order No. 773), *supra* note 2, 72 P.U.R.3d at 158. See note 12, *infra*.

9. D.C. Transit Sys., Inc. (Order No. 773), *supra* note 2, 72 P.U.R.3d at 159. See Compact, *supra* note 4, tit. II, art. XII, § 6(a)(3), quoted *infra* note 15.

10. D.C. Transit Sys., Inc. (Order No. 773), *supra* note 2, 72 P.U.R.3d at 159.

excess of a fair return," [11] but that somewhat smaller increases, which the Commission allowed, would produce just and reasonable results.[12] By the two orders responsive to subsequent applications for reconsideration, the Commission maintained that position without change.[13]

Petitioner first contends that the Commission failed to adequately assess the hardship imposed upon the busriding public by the fare raises which it allowed. During the hearings, petitioner introduced exhibits showing that an elevation of fares would adversely affect Transit's patrons, particularly those on low and fixed incomes, and that many were unable to afford other means of transportation. Indeed, evidence was hardly essential to a triggering of the Commission's responsibility to minimize the impact of higher fares. In its ratemaking function—which no longer obtains as to Transit [14]—the Commission labored under a mandate to "give due consideration, among other factors, . . . to the need, in the public interest, of adequate and efficient transportation serv-

ice by such carriers at the lowest cost consistent with the furnishing of such service . . . ." [15] We ourselves have underscored the Commission's duty to "see to it that the fare-payers pay no more than is necessary to ensure the continued adequacy of the company's service and provide a return to the shareholders that is reasonable under the circumstances." [16] As is well known, any appreciable increase in the cost of public transportation renders the service less useful to the community.[17] It is obvious, too, that such an increase lays its heaviest burden on the poor, and may even price some marginal riders out of the market.

We do not, however, discern on the Commission's part any indifference toward this problem. Rather, the indications of record are that the Commission was advertent to the consequences of fare raises and did its best to ameliorate them.

In dealing with Transit's application for leave to elevate its fares, the Commission was called upon to bal-

11. *Id.*

12. *Id.* at 159–160. The principal increases were in cash fares from 25 cents to 27 cents, and in token fares from four for 98 cents to four for $1.00, in the District of Columbia. *Id.* at 160.

13. D.C. Transit Sys., Inc. (Order No. 781a), *supra* note 3, 74 P.U.R.3d at 181.

14. See Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 1, 158 U.S.App.D.C. at — - —, 485 F.2d at 827–829. Relief with respect to any error vitiating Order No. 773 would now be afforded by way of restitution. *Id.* at 1082.

15. "In the exercise of its power to prescribe just and reasonable fares and regulations and practices relating thereto, the Commission shall give due consideration, among other factors, to the inherent advantages of transportation by such carriers; to the effect of rates upon the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient transportation service by such carriers at the lowest cost consistent with the furnishing of such service; and to the need of

revenues sufficient to enable such carrier under honest, economical, and efficient management, to provide such service." Compact, *supra* note 4, tit. II, art. XII, § 6(a)(3).

16. D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, 121 U.S.App.D.C. 375, 402, 350 F.2d 753, 780 (en banc 1965).

17. A fare increase is inevitably accompanied by a drop in ridership. This phenomenon is reflected in ratemaking practice by a "resistance factor"—a percentage figure related to ridership fall-off—which was applied by the Commission and Transit to each one percent of fare increase to calculate the number of rides which would occur at the new rate and the revenues which those rides would generate. See D.C. Transit Sys., Inc. (Order No. 1052), 85 P.U.R.3d 1, 18 (WMATC 1970); D.C. Transit Sys., Inc. (Order No. 773), *supra* note 2, 72 P.U.R.3d at 122–23; Bristol Traction Co., 94 P.U.R. (n. s.) 140, 144 (Conn. Pub.Utils. Comm'n 1952); Honolulu Rapid Transit Co., 90 P.U.R. (n. s.) 129, 138 (Hawaii Pub. Utils. Comm'n 1951); Baltimore Transit Co., 94 P.U.R. (n. s.) 129, 138 (Md. Pub. Serv. Comm'n 1952).

ance the interests of both the company and the public.[18] Much of the evidence taken during the Commission's extensive hearings explored Transit's operating costs, and Order No. 773 reflects the Commission's careful analysis and scrutiny of expense data.[19] The factor contributing mainly to the raises which the Commission allowed was an inescapable increase of $1.5 million to Transit's labor costs during the future annual period.[20]

■ As a utility's expense of providing service to the public unavoidably inflates, the price charged for the service must also rise. This is the more so in the labor-concentrated transit industry, wherein fewer expense decreases through technological advances are feasible. And, of course, any raise in Transit's fares was bound to promote difficulties for some. To ease the financial burden of the fare increases in question, the Commission permitted Transit to scale down its bus-purchase program,[21] and thereby to extend the depreciation life of its existing rolling stock,[22] and the rate of return the Commission allowed cannot be deemed immodest.[23] We perceive no ground for disturbing the Commission's order in this respect.[24]

■ Petitioner further contends that the Commission erred in including Transit's retained earnings as part of the base upon which its computation of return on equity was made.[25] We think that position cannot be sustained. Transit's net earnings after taxes were stockholder property [26]—property which its management was free to reinvest in the company. Earnings reinvested in the business enterprise become equity capital no less than other capital contributions do, and are entitled to considera-

---

18. See Compact, *supra* note 4, tit. II, art. XII, §§ 6(a)(3), (4), quoted *supra* note 15; D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 121 U.S.App.D.C. at 400, 350 F.2d at 778.

19. D.C. Transit Sys., Inc. (Order No. 773), *supra* note 2, 72 P.U.R.3d at 124–33.

20. *Id.* at 120.

21. The requirement for annual purchases of new buses was reduced from one-twelfth to one-fourteenth of Transit's fleet. *Id.* at 160.

22. The extension was from twelve to fourteen years. See note 21, *supra.* This produced a saving of about $500,000 annually. *Id.* at 161.

23. The Commission found that the fares set by its last previous rate order—No. 684, see note 5, *supra*—were providing a fair return. D.C. Transit Sys., Inc. (Order No. 773), *supra* note 2, 72 P.U.R. 3d at 121. The Commission, however, could foresee no way to avoid an increase in fares to meet the $1.5 million annual increase in Transit's labor costs. *Id.* at 120. The fares authorized by Order No. 684 were projected to produce net operating income of $1,544,246 during the ensuing twelve months, which was insufficient to cover interest expenses, meet the additional labor costs and also provide a fair return. *Id.* at 120–21. Accordingly, the fare increases authorized by Order No. 773 were calculated to produce net operating income of $2 million, of which $767,000 would be a return on equity. *Id.* at 151–52. This was a rate of return of 5.33 percent, and it coincided with the recommendation of an expert whose opinion was that it would have "the least effect upon the movement of traffic" and would "produce the least resistance required by an increase in fares." *Id.* at 159. Although this return was somewhat less than it had been in previous years, the Commission considered it adequate, feeling that Transit's risk to capital diminished as it became better established in the community. *Id.* at 153.

24. *E. g.,* Universal Camera Corp. v. NLRB, 340 U.S. 474, 496–497, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

25. It should be noted that the Commission traditionally considered return on equity as only one of several ratemaking factors in determining a fair margin of return. *See* D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App.D.C. at 237 n. 97, 466 F.2d at 408 n. 97; D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 121 U.S. App.D.C. at 400, 350 F.2d at 778.

26. See Board of Pub. Util. Comm'rs v. New York Tel. Co., 271 U.S. 23, 32, 46 S.Ct. 363, 70 L.Ed. 808 (1926). See generally A. Priest, Principles of Public Utility Regulation 200–02 (1969).

tion in the calculation of fair return to the same extent that any other capital investment is.[27] Reinvested earnings, like other components of investors' equity, are risked in the business, and in the same degree warrant compensation for the risk.

There is nothing to suggest that Transit's earnings were unnecessarily reinvested in order to secure higher fares that could not be justified otherwise. On the contrary, Transit's recent financial history has consistently connoted instability, for which its low capitalization was largely responsible.[28] Moreover, Transit's equity fund was overwhelmingly its retained earnings—as the Commission found, stockholder equity in Transit on May 31, 1967, was $500,000 in initially-contributed capital and $2,-261,544.04 in reinvested earnings[29]—so that there was every reason for the Commission to encourage a buildup of equity through retentions of earnings. An important inducement to accumulate earnings as reinvested capital is the expectation that a return on all equity will be given consideration in the determination of just and reasonable fares.[30] To

have removed the incentive to reinvest Transit's earnings in the business would have jeopardized one of its prime sources of new capital.

■■ Petitioner also argues that the Commission gave improper consideration to Transit's high debt-equity ratio in determining the rate of return it allowed. The reasoning is that that ratio, as primarily a management decision, is set in the interest of maximum return on investment, and should not be allowed to support a claim of inadequate return. We find this argument unacceptable. We have heretofore held that the ratio of Transit's debt to its equity is a factor to be taken into account in ascertaining a fair return.[31] The uncontradicted evidence in the record before us is that Transit can obtain debt capital at far less cost than equity capital.[32] By the same token, a smaller rate of return may be required for an enterprise having a high debt-equity ratio than for one for which the ratio is substantially lower.[33] To the extent that a utility's operations and service are adequately and efficiently maintained at a lower aggregate cost, the ratepayer reaps a benefit.[34]

27. See Boston Consol. Gas Co. v. Department of Pub. Utils., 327 Mass. 103, 107, 97 N.E.2d 521, 524 (1951). See also D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 121 U.S.App.D.C. at 400, 350 F. 2d at 778.

28. See D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 121 U.S.App.D.C. at 402, 350 F.2d at 780; D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, *passim*.

29. D.C. Transit Sys., Inc. (Order No. 773), *supra* note 2, 72 P.U.R.3d at 148.

30. We have had occasion to point out that the Commission had to consider, as a relevant factor in the determination of a just and reasonable fare, "the incentives required by a stockholder to keep his money in the business and the dividends and growth rates requisite to supply these incentives. . . ." D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 121 U.S. App.D.C. at 401, 350 F.2d at 779.

31. *Id.*

32. During the hearings, one expert testified that Transit would have to pay about 32 percent to attract equity capital but only about 7 percent to obtain debt capital. Another testified that Transit's costs of equity capital would be about 15 percent while the cost of debt capital would be 7.5 percent. D.C. Transit Sys., Inc. (Order No. 773), *supra* note 2, 72 P.U.R. 3d at 141–144.

33. One of the factors which may be taken into consideration in calculating rate of return to a public utility, however, is the degree of risk to which its capital is put. Greater risks to the utility, *i. e.*, financial instability, may result from a high debt-equity ratio; therefore, the rate of return may be proportionately higher. See D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App.D.C. at 228 n. 33, 466 F. 2d at 399 n. 33.

34. Admittedly, there are factors which may also make a high debt-equity ratio unbeneficial to riders, among which are the

There is no basis in this record upon which we could conclude that the Commission's treatment of Transit's debt-equity ratio contributed to the fare increases it awarded.

Petitioner's final contention is that the Commission erred in viewing, on the question of fair return to Transit, the latter's position as a component of a corporate conglomerate.[35] In Order No. 773, the Commission called attention to two prior administrative rulings[36] that that position affected the risk factor for which Transit was compensated in the computation of its rate of return.[37] We do not examine the merits of this facet of petitioner's presentation for the point is not properly before us.

The Washington Metropolitan Area Transit Regulation Compact,[38] which defines our jurisdiction to review Commission action, authorizes persons affected by final Commission orders to seek reconsideration by the Commission, requires that the applicant for reconsideration "stat[e] specifically the errors claimed as grounds for such reconsideration,"[39] and specifies that "[n]o person shall in any court urge or rely on any ground not so set forth in such application."[40] Only recently we held that failure to submit a question to the Commission for administrative reconsideration forecloses judicial review of that question.[41] Petitioner did not include among the specifications of error in her application to the Commission for reconsideration any issue as to the propriety of recognizing the risk factor in Transit's case for what it really was. It follows that the issue cannot now be litigated here.

To the extent reviewed in this opinion, Order No. 773 is

Affirmed.[42]

---

inhibition to reinvest and improve service because the return to equity is low, and the degeneration of a utility's financial condition to a point of instability. See D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 16, 121 U.S.App.D.C. at 401, 350 F.2d at 779. And see D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4.

35. Transit is a wholly-owned subsidiary of D.C. Transit of Delaware, which, in turn, at the time of the proceedings before the Commission, was itself a wholly-owned subsidiary of Trans-Caribbean Airways, Inc. In addition to Transit's local transportation business, the corporate complex of which Transit is a part engaged in some number of unrelated operations which were conducted through subsidiaries of Transit and through other subsidiaries of its parent corporation.

36. D.C. Transit Sys., Inc. (Order No. 684), *supra* note 5, at 16–20; D.C. Transit Sys., Inc. (Order No. 656) (WMATC Jan. 12, 1967) (unreported), at 25–28.

37. In D.C. Transit Sys., Inc. (Order No. 684), *supra* note 5, at 14, the Commission accepted testimony that, because of its position in the Trans-Caribbean holding system, Transit was a smaller business risk than other transit companies, and that resultantly it had readier access to capital markets. By that analysis, of course—which Transit has consistently opposed—Transit's cost of debt capital was lowered and its entitlement to compensation for the risk factor in its rate of return was lessened.

38. *Supra* note 4.

39. "Any person affected by any final order or decision of the Commission may, within thirty days after the publication thereof, file with the Commission an application in writing requesting a reconsideration of the matters involved, and stating specifically the errors claimed as grounds for such reconsideration. No person shall in any court urge or rely on any ground not so set forth in such application." Compact, *supra* note 4, tit. II, art. XII, § 16.

40. See note 39, *supra*.

41. D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n, *supra* note 4, 151 U.S.App.D.C. at 242–243, 466 F.2d at 413–414.

42. But see Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, *supra* note 1.