772 F.2d 1282
 NORTH AMERICAN TELECOMMUNICATIONS ASSOCIATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
New England Telephone and Telegraph Co., et al., Intervening
Respondents.
U.S. WEST, INC., Petitioner,
and
AMERICAN INFORMATION TECHNOLOGIES CORPORATION, et al.,
Intervening Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Rolm Corporation, et al., Intervening Respondents.
U.S. WEST, INC., Petitioner,
and
AMERICAN INFORMATION TECHNOLOGIES CORPORATION et al.,
Intervening Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
North American Telecommunications Association, et al.,
Intervening Respondents.
 Nos. 84-2216, 84-2853 and 85-1425.
 United States Court of Appeals,
Seventh Circuit.
 Argued (Nos. 84-2216, 84-2853)
June 13, 1985.
Submitted (No. 85-1425)
July 22, 1985.
Decided Aug. 27, 1985.
 
 Denise Bonn, Albert H. Kramer, on the brief, Wood, Lucksinger & Epstein, North American Telecommunication Assn'n. , Washington, D.C., for petitioner.
 Linda L. Oliver, F.C.C., Washington, D.C., for respondents.
 Before BAUER and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.
 POSNER, Circuit Judge.
 
 
 1
 Last summer, in Illinois Bell Tel. Co. v. FCC, 740 F.2d 465 (7th Cir.1984), we upheld an order by the Federal Communications Commission establishing conditions under which the Bell operating companies, having been divested from American Telephone and Telegraph Company as part of the settlement of the government's antitrust suit against AT & T, could resume the marketing of telephone handsets and other "customer premises equipment" (as well as "enhanced services," but they are not important in the present case) to their subscribers. We had thought that, having upheld the order, and review by the Supreme Court of our decision not having been sought, we were through with the matter; but, alas, no. Two of the three review proceedings that we have consolidated for decision involve challenges to aspects of the order that were not before us last year, under the guise of challenging the Commission's denial of petitions to reconsider the order we upheld. The third involves a challenge to a subsequent order of the Commission further reaffirming a provision of the original order. The reason that there are three petitions to review two orders is that two petitions challenging one order were originally filed in two circuits, the District of Columbia circuit and this circuit, and the Court of Appeals for the District of Columbia Circuit transferred its petition to us. See North American Telecommunications Ass'n v. FCC, 751 F.2d 207, 208 (7th Cir.1984) (per curiam).
 
 
 2
 Until 1984 the American Telephone and Telegraph Company had a powerful hold over the market for telephone handsets and other customer premises equipment. AT & T's Western Electric subsidiary manufactured the equipment and sold it to the Bell operating companies, which in turn leased (or in recent years, sold) the equipment to their subscribers. The operating companies also bought some equipment from independent manufacturers to sell or lease to their subscribers and in recent years their subscribers bought or leased some equipment from independent manufacturers directly. But most of the customer premises equipment in areas served by the Bell operating companies was equipment that the companies had bought from Western Electric and leased to their subscribers.
 
 
 3
 This condition changed completely in 1984, when the consent decree settling the government's massive antitrust suit against AT & T took effect. The decree spun off the operating companies from AT & T but did not make them free-standing. Instead it authorized the creation of a new tier of companies, the "Regional Bell Operating Companies," each a holding company set up to own several former Bell operating companies serving contiguous areas. Another provision of the decree transferred to AT & T all of the customer premises equipment formerly owned by the Bell operating companies and leased to subscribers. Hence the regional companies, and their Bell operating company subsidiaries, were out of the equipment business. But the decree did not require that they keep out; it left it up to the FCC to decide under what conditions they could come in.
 
 
 4
 The order we upheld last summer was the order setting those conditions. Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Enhanced Services and Cellular Communications Services by the Bell Operating Companies, 95 F.C.C.2d 1117 (1984). We shall call this, the first of the three orders involved in this case, the "separate-subsidiary" order. It requires the regional companies if they want to get into the equipment business to create subsidiaries for this purpose that have their own personnel and premises. The Bell companies challenged this requirement as too harsh but we upheld it. The North American Telecommunications Association, which comprises independent companies (i.e., not affiliated with telephone companies) that make, sell, or install customer premises equipment, challenged the Commission's order as too gentle but we dismissed the Association's challenge as untimely. 740 F.2d at 477. The Association had appeared as an intervening respondent, filing its brief at the same time as the parties supporting the Commission's order rather than the parties attacking it, even though the Association was one of the attackers. By filing when it did the Association prevented the Commission and the true intervening respondents from filing a responsive brief, and this could not be allowed. But cf. California Public Broadcasting Forum v. FCC, 752 F.2d 670, 683 n. 10 (D.C.Cir.1985).
 
 
 5
 That did not stop the Association, however, for along with other parties it had filed motions asking the Commission to reconsider the separate-subsidiary order, and three days before we upheld that order the Commission had reaffirmed it in In re Petitions for Reconsideration of an Order in Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Etc., 49 Fed.Reg. 26056 (June 26, 1984), the "reconsideration order." The Association has filed a petition for judicial review of the reconsideration order and that is one of the petitions before us. In addition, some of the regional companies, in their motions asking the Commission to reconsider the separate-subsidiary order, had questioned the Commission's jurisdiction over them, as distinct from over the operating companies; and two of the regional companies have filed petitions for review challenging the part of the reconsideration order in which the Commission held that it had jurisdiction and that the regional companies must get the Commission's approval for their plans of capitalization.
 
 
 6
 Finally, the same two regional companies ask us to set aside a third order by the Commission, in which it reaffirmed its jurisdictional holding and made clear that the regional companies face sanctions if they do not file the required plans of capitalization. In re American Information Technologies, Inc., et al., Capitalization Plans for the Furnishing of Customer Premises Equipment and Enhanced Services, FCC Mimeo No. 85-28 (Feb. 4, 1985). This is the "capitalization order." We accelerated briefing on the petitions to review this order so that we could resolve as many of the related controversies among the parties as possible at the same time. This, then, is the set of challenges that we have consolidated for decision today.
 
 
 7
 The Association's challenge is to three exceptions that the Commission allowed to the stringent separation required between the Bell operating companies and the equipment subsidiaries of the regional companies. Before taking up the merits of the challenge we remark its unusual procedural posture. Having a year ago dismissed the Association's challenge to the FCC's separate-subsidiary order as untimely, we are now asked to consider the identical challenge on review of the FCC's refusal on reconsideration to change the order.
 
 
 8
 This duplication of review proceedings would be impossible if the reconsideration order had been issued by a district court rather than the Federal Communications Commission. A party to a district court proceeding who wants the court to reconsider its judgment must within 10 days file a motion under Fed.R.Civ.P. 59(e) to alter or amend the judgment. See A.D. Weiss Lithograph Co., v. Illinois Adhesive Products Co., 705 F.2d 249 (7th Cir.1983) (per curiam). A timely filing precludes an appeal from the district court's decision until the motion is decided, Fed.R.App.P. 4(a)(4), at which time both the original judgment and the decision (if itself a final decision within the meaning of 28 U.S.C. Sec. 1291) on the Rule 59(e) motion are appealable within the time provided by Fed.R.App.P. 4(a)(1), see, e.g., Sutliff, Inc. v. Donovan Cos., 727 F.2d 648, 652 (7th Cir.1984). If the party does not file a Rule 59(e) motion within the appointed time, then he may of course appeal the district court's decision immediately. But if he fails to take a timely appeal, he cannot get appellate review of that decision indirectly, by filing a motion under Fed.R.Civ.P. 60(b) to vacate the district court's judgment and then appealing from the denial of that motion. See, e.g., Bank of California v. Arthur Andersen & Co., 709 F.2d 1174, 1176-78 (7th Cir.1983); Schildhaus v. Moe, 335 F.2d 529, 531 (2d Cir.1964) (Friendly, J.). This is essentially the end run tried by the North American Telecommunications Association in this case; and if successful it will nullify our action in dismissing its challenge to the Commission's original order as untimely.
 
 
 9
 But we conclude, although with reluctance, that the Association's end run has succeeded. Section 405 of the Communications Act of 1934, as amended, 47 U.S.C. Sec. 405, gives a person aggrieved by an FCC order 30 days to petition the Commission for reconsideration, and his time for obtaining judicial review of the order does not begin to run till the Commission has acted on the petition. See, e.g., Spanish Int'l Broadcasting Co. v. FCC, 385 F.2d 615, 621 (D.C.Cir.1967); cf. Samuel B. Franklin & Co. v. SEC, 290 F.2d 719, 725 (9th Cir.1961). (Section 405 has the distinct function, noted briefly later in this opinion, of making sure that the FCC has an opportunity to consider any challenge, legal or factual, to its order before the challenge is brought to court. See, e.g., Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 680-83 (D.C.Cir.1983).) But unlike the counterpart situation in district court proceedings, the petitioner for reconsideration need not wait for the Commission to act on his petition before he can seek judicial review. See Samuel B. Franklin & Co. v. SEC, supra, 290 F.2d at 725. Hence we could be faced with a case where, the Commission having issued an order and we having upheld it, a party to the review proceeding could come back to us on a petition to review an order denying a petition for reconsideration filed within 30 days of the original order. This is essentially the present case except that the Association's previous challenge in this court to the separate-subsidiary order was dismissed as untimely rather than rejected on the merits.
 
 
 10
 Inefficient as such procedural redundancy is, its defects would be tolerable if the Commission had stringent criteria for reconsideration, since on the second judicial review the only issue open is whether the Commission erred in denying the petition to reconsider, not whether it erred in its original order. The Commission's rules of procedure, however, contain a catch-all provision that allows the Commission to reconsider its decision de novo even if no new material is presented, see 47 C.F.R. Sec. 1.429(b)(3), and apparently that is the basis on which the Commission proceeded in the present case. The Commission did not deny the petition for reconsideration on the ground that there was nothing new in the petition; it just repeated that the Association's criticisms of the separate-subsidiary order lacked merit. And no party in this court has questioned the propriety of the Association's end run. As neither the statute nor the Commission's rules forbid it to deny a motion for reconsideration on the ground that the original order was correct, and as denying judicial review of such denial would be a harsh sanction for the Association's untimely filing of its previous review proceeding and a sanction that as we have said no party asks us to impose, we shall take up the merits, and decide whether the separate-subsidiary order was correct in the particulars challenged by the Association.
 
 
 11
 The Association's first challenge is to a provision allowing each of the regional companies, for a period of four years after divestiture (that is, four years after January 1, 1984), to send to persons who both subscribe to the service of the regional company's telephone company subsidiary and lease customer premises equipment from the regional company's equipment subsidiary a single bill for telephone service and equipment. The Commission's purpose in allowing a joint-billing exception to the strict separation of telephone services from equipment was to prevent confusion of customers. Until divestiture, the customers of the Bell operating companies were accustomed to obtaining both service and equipment from the same company, the Bell operating company, and to paying a single charge for both, denominated as a service charge. During the four-year transition those customers who obtain their equipment from the telephone company will be charged separately but on one bill that will list separate charges for telephone service and for equipment. In this way they will gradually get accustomed to the fact that these are separate things for which they are paying, and they will be less surprised when eventually they start to receive separate bills, from separate subsidiaries of the regional companies, one for service and one for equipment.
 
 
 12
 The thinking behind the transition period may seem paternalistic and the period itself too long, but judicial review of an agency's determination that the customers for a regulated service need a specific form of protection from confusion or deception is particularly narrow, because the determination is judgmental. United Air Lines, Inc. v. CAB, 766 F.2d 1107, 1112-13 (7th Cir.1985). Although prices for customer premises equipment--prices that the FCC once regulated as part of its regulation of telephone service--are no longer regulated, the Commission can relinquish control of prices while rationally believing that customers continue to need protection from deception, just as Congress decided to eliminate rate and entry regulation in the airline industry while continuing to allow regulation designed to prevent deceptive and unfair practices. See id. at 1109-12.
 
 
 13
 The Association, however, views the transition period itself as an engine of deception. It argues that a person who receives a bill on which a charge for equipment appears alongside a charge for telephone service will fear that if he doesn't pay the equipment charge, his telephone service will be cut off; and fearing this he will pay up and the equipment company will not be plagued by deadbeats, while the Association's members will be and this will make them less able to compete with the Bell operating companies. Now as a matter of fact a telephone company is not allowed to cut off telephone service as a way of collecting a debt owed to the company's equipment subsidiary, but many consumers may not know this. Since the members of the Association are independent providers of telephone equipment, no customer of theirs will fear the cutting off of his telephone service if he fails to pay for equipment he has bought or leased, and the Association's members are therefore at a disadvantage in getting paid and hence in competing with the equipment subsidiaries of the regional companies. No effort to set a price tag on this disadvantage has been made, however, and we do not think the Commission was required to give great weight to an argument left in so highly speculative a posture.
 
 
 14
 Moreover, on the speculative plane that the argument inhabits it overlooks several possibilities. One is that if people who buy customer premises equipment from a telephone company's affiliate do not know that the telephone company cannot cut off their service if they fail to pay for the equipment, people who buy equipment from an independent supplier may not know that the supplier cannot get the telephone company to cut them off if they default, much as an ordinary creditor might get his debtor's employer to garnish the debtor's wages. If people do not know that, the Association will not be at a competitive disadvantage; it will benefit from consumer ignorance as much as companies that have affiliates that provide telephone service.
 
 
 15
 Another possibility is that a telephone subscriber who has a choice between leasing his equipment from a firm that (he thinks) can terminate his telephone service if he gets into a dispute with it and leasing it from a firm that does not have this fell power will prefer the latter firm. To offset this preference the equipment subsidiaries of the regional companies will have to offer customers more favorable terms. Any extra profit from having fewer deadbeats will be used to pay for the inducements necessary to get people to submit to what they think is a harsh collection device. Granted, the offset may not be perfect. Moreover, customers may sort themselves into the potential deadbeat and the predictably reliable, with the members of the Association getting the former and the regional companies the latter. In that event the regional companies will offer no inducements, being happy to cede the deadbeats to the independents. But all this just shows that the issue of consumers' mistakenly ascribing greater powers of debt collection to the regional companies than to the independent companies is too speculative to invalidate the Commission's rule. Everyone is making guesses; the principles of judicial review of administrative action require deference to the agency's guesses.
 
 
 16
 Next the Association challenges a provision in the order that allows, without limit of time, the same Bell operating company employees who install basic (single-line) telephone service for a home or business also to install and maintain a single-line telephone for the customer. This is an exception to the requirement that the separate subsidiaries for telephone service and customer premises equipment must have separate personnel. The Commission's reason for allowing this exception is that the installation and maintenance of the simplest telephone--the single-line telephone--are such simple operations that distinguishing the costs of the equipment from the costs of the telephone service will be easy. The Commission of course rejected accounting separation as an alternative to the physical separation of staff and premises required by its separate-subsidiary order, but did so because of the difficulty of separating common costs by the methods of accounting, and it thinks the difficulty will be slight in the case of the basic telephone handset.
 
 
 17
 Since most telephone service is basic residential and small-business service--most homes, and most very small businesses, have telephones with just a single line and no other telecommunications equipment--this is a major exception to (some might say a loophole in) the requirement of physically separate subsidiaries for service and equipment, although the trend toward "modular" phones, which simply plug into a telephone jack and hence do not require installation, may eventually make the exception of academic significance. But an agency has, in the nature of things, a particularly broad discretion when balancing considerations left formless and unmeasured because of the parties' failure to present empirical evidence. See Illinois Bell Tel. Co. v. FCC, supra, 740 F.2d at 474. This is such a case.
 
 
 18
 On one side of the ledger was the danger that the regional companies would gain an uneconomical advantage over their independent competitors in the equipment market, either by allocating some of the costs of equipment to telephone service in order to make the equipment look cheaper to the customer or by forcing the customer to take their equipment as a condition of obtaining adequate service. The parties made no effort to measure the danger. On the other side were the costs (also unquantified) in forgone economies of scope from forcing the regional companies to provide such closely related goods as telephone service and customer premises equipment with different staffs and from different premises. The balance differs with the kind of equipment. In the case of the simplest equipment, the danger is small that a regional company whose telephone company subsidiary is allowed to provide the personnel who install and maintain the equipment will smuggle the costs of installation and maintenance into the line (service) charges. Those costs can readily be determined and the regional companies made to account for them effectively. At the same time, the economies of joint provision are large: the fewer people needed for joint provision, the less economical it would be to insist that the same people can never provide both. This can be seen most clearly by imagining that it takes only one person to install both the telephone line and the telephone handset.
 
 
 19
 Balancing intangibles is an administrative responsibility par excellence. Reviewing courts should not attempt to second-guess the performance of this task, for they can do little to improve it. Unless the agency commits a logical error or overlooks evidence contrary to its result, its judgment will not be rejected. It did neither here. The Commission was not compelled as a matter of law to require featherbedding in the provision of closely related goods (the telephone line and the telephone) in order to shield the members of the North American Telecommunications Association from all risk of unfair competition.
 
 
 20
 This brings us to the third and most serious challenge mounted by the Association against the Commission's order, the challenge to "dial-tone referral." The Commission's order provides that when a customer telephones a Bell operating company to order telephone service (the usual way of ordering such service), and asks about getting a telephone or other customer premises equipment, the operator must tell him that as a result of the antitrust consent decree the company no longer provides equipment, but that many companies, including an affiliate of the operating company, do. In addition--and here is the part that the Association challenges--the operator after saying this may ask the customer ("in a neutral fashion") whether he would like the call transferred to the telephone company's equipment affiliate and may, if the customer says "yes," transfer the call so that the customer does not have to dial again. This privilege, which like the joint installation and maintenance of single-line telephone service and equipment has no expiration date, the Association regards as giving the regional companies an unfair competitive advantage over its members.
 
 
 21
 Dial-tone referral must confer some advantage on the regional companies even if the operators always inflect their voices neutrally. It pretty much ensures that the regional company's equipment subsidiary will get first crack at most potential residential and small-business customers for telephone equipment. But whether first crack confers a big advantage over independent providers of equipment is not so clear. That depends on the level of customer awareness of the intensely competitive character of the telecommunications equipment market. Thus the lack of a time limitation on the right of dial-tone referral may be harmless, since customer awareness of the competitive nature of the industry will certainly grow rather than decline.
 
 
 22
 Two factors support dial-tone referral. The first is AT&T's powerful headstart in the market for customer premises equipment by virtue of taking over the existing Bell system equipment. The Commission wants the Bell operating companies to be able to compete effectively with AT&T, starting as they are from zero market shares. Second--and this distinguishes the Bell operating companies from other new entrants into the equipment market--the Commission was concerned that without dial-tone referral, customers would be confused. As we noted in connection with joint billing, customers long were accustomed to getting the line and the telephone from the same company, the telephone company, usually a Bell operating company. It was not like electricity, where you get the line from the electric company but not the toaster, or the blender, or the electric tooth brush. The telephone line has for the ordinary user only one use, and he therefore has difficulty understanding why he must deal with more than one supplier. If the telephone company just installed the line and said to the subscriber, "you have your line, now find something to plug into it," the subscriber, at least the subscriber who does not follow developments in antitrust and regulation raptly, would be as perplexed as the buyer of an automobile who was told by the auto dealer to go buy the tires for the car elsewhere.
 
 
 23
 The most questionable feature of dial-tone referral is allowing the operator, if the caller requests, to transfer the call directly to the equipment subsidiary. If the caller were just given the subsidiary's phone number, the subsidiary would be placed on a more equal plane with the independent providers of customer premises equipment. But we cannot say that call transfer (the feature of dial-tone referral that gives it its name) condemns the Commission's order. It is after all a legitimate convenience to the caller not to make him call twice. And no doubt some callers would think it distinctly odd for the telephone company to make them place a second call, to the telephone company's own affiliate, in order to get equipment necessary to make telephone service worth anything to them.
 
 
 24
 And as with the allowance of joint billing, which rests on a similar concern with potential confusion of customers, we are not in a position to second-guess the Commission's determination that the benefits of dial-tone referral in reducing customer confusion and disaffection outweigh the costs in reduced competition in the equipment market. As the Association has made no effort to gather any evidence on the effects of dial-tone referral, which has been in force now for more than a year and a half--not even to the extent of monitoring the neutrality of the operators' responses, as the Association could easily have done by calling up the operating companies on a random basis--we are again being asked, and we decline, to reverse a judgmental determination by the Commission.
 
 
 25
 An obvious alternative to dial-tone referral would be call transfer to a randomly selected equipment supplier, which would sometimes be the phone company's affiliate and sometimes an independent provider. The operator could say to the customer, "If you don't have any preference regarding a supplier of customer premises equipment, I can connect you to an approved supplier chosen at random." This is the technique that has been adopted for equalizing competition in the long-distance telephone service market between AT&T and the independent providers of that service. But we cannot fault the Commission for not having used this technique here, when for all that appears none of the parties has suggested that it do so. We add that as there are many more suppliers of equipment than suppliers of long-distance service, the problems inherent in random assignment (who should be eligible? how often should a given firm get a random assignment?) would be amplified if the technique were used in the equipment market.
 
 
 26
 Admittedly it is difficult to understand, given the close relation between the joint-billing and dial-tone-referral rules, why the former is to expire after four years and the latter is to go on indefinitely. But this inconsistency is not serious enough to invalidate either or both rules, especially since, as we have noted, the competitive effects of dial-tone referral will diminish over time. Moreover, it will be open to the Association, after four years or even sooner if it wants, to go back to the Commission and say, there is no longer a danger of customer confusion, so rescind dial-tone referral. The Commission will be obliged at least to consider the argument. Cf. 47 C.F.R. Sec. 1.429(b); Atchison, Topeka & Santa Fe Ry. v. United States, 284 U.S. 248, 261-62, 52 S.Ct. 146, 150, 76 L.Ed. 273 (1932); Geller v. FCC, 610 F.2d 973, 979-80 (D.C.Cir.1979) (per curiam); Illinois Central Gulf R.R. v. ICC, 720 F.2d 958, 962-63 (7th Cir.1983); but cf. Bowman Transport., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 295-96, 95 S.Ct. 438, 446-47, 42 L.Ed.2d 447 (1974). In an industry as mutable as telecommunications, rules that do not expire automatically at a fixed date are not thereby given eternal life. Four years from now the situation in the industry may be so different that the rule will be thoroughly obsolete. Or it may be that while by then very few customers will require dial-tone referral to protect them from being confused or disgruntled, by the same token so many customers will be conscious of the advantages of shopping around before deciding whose equipment to buy that the competitive disadvantages of which the Association complains will be minute.
 
 
 27
 The Commission is not required to wrap up at one time every regulatory loose end left flapping in the wake of a seismic regulatory event such as the divestiture of the Bell operating companies. It is not required to insist on an airtight separation between the operating companies and their equipment affiliates when the result might well be potential confusion for many customers, merely for the sake of what may be quite modest gains in making the equipment industry more competitive. The Commission is allowed to feel its way as it has done by giving the regional companies some breathing room to integrate their service and equipment offerings.
 
 
 28
 The other issues before us derive from the argument by two of the regional companies that the Commission has no power to regulate them because they are not common carriers. We should make clear exactly what is at stake here (less than meets the eye). The companies are not arguing that the separate-subsidiary order is invalid because addressed to entities over which the Commission has no jurisdiction. They concede that the Commission can tell the Bell operating companies--common carriers that remain under the Commission's regulatory aegis even though now owned by the regional companies rather than AT&T--not to provide customer premises equipment to their subscribers, or affiliate with any entity that does so unless it is physically separated. They concede that the Commission can demand of them whatever information it needs to make sure they are not using the holding-company form to evade the requirement that the equipment subsidiary really be separate. Cf. 47 U.S.C. Sec. 219(a). They are not challenging the disapproval of their plans of capitalization, either, as they have not submitted their plans yet, so there is nothing to approve or disapprove. They merely balk at being ordered to submit plans of capitalization that the Commission might disapprove. Their challenge is nevertheless ripe because they face sanctions if they disobey the order. See, e.g., Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 417-19, 62 S.Ct. 1194, 1200-01, 86 L.Ed. 1563 (1942); A.O. Smith Corp. v. FTC, 530 F.2d 515, 522 (3d Cir.1976).
 
 
 29
 The Communications Act of 1934, the Commission's charter, does not authorize the Commission to regulate holding companies. Although AT&T in 1934 as until 1984 was a holding company owning telephone companies, it was also a direct provider of interstate telephone service through its Long Lines Division, and it was therefore a common carrier regulable by the FCC. As the Bell operating companies were also common carriers in interstate commerce, see California v. FCC, 567 F.2d 84 (D.C.Cir.1977) (per curiam); 47 U.S.C. Sec. 152, the interactions among them and with AT&T were snugly within the Commission's grasp even though the Commission had no explicit power to regulate holding companies.
 
 
 30
 Congress's omission to confer such power was not inadvertent; the matter was addressed in the debates. In this court the Commission makes the odd argument that the regional companies should not be allowed to argue legislative history to us, because they did not argue legislative history to it. It appeals to the rule that you cannot ask a court to strike down an agency's order on a ground you did not give the agency a chance to address. This is a basic rule of administrative law, see, e.g., SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943); General Elec. Co. v. NRC, 750 F.2d 1394, 1404 (7th Cir.1984), and in the case of the FCC has a statutory basis, too, see 47 U.S.C. Sec. 405, discussed earlier. But no statute and no judge-made rule forbid a party to do additional research and present the results to the reviewing court. Although emphatic that courts should defer broadly to an agency's interpretation of the statutes it administers, see, e.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., --- U.S. ----, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984), the Supreme Court has not stated or implied that every argument, or every fruit of library research, bearing on statutory interpretation must be offered to the agency first, or be forever withheld from judicial consideration. That would imply that we could not do any independent research on legislative history in administrative cases; we would be limited to the materials submitted to the agency. That would be a silly restriction. The Commission has the same access to legislative-history materials as we; we do not think it can prevent a party from inviting our attention to those materials just because the Commission didn't bother to do any independent research, any more than it can prevent us from relying on a case not cited to it.
 
 
 31
 But we do not draw the same inferences from the legislative history that the petitioners do. A bill, H.R. 8301, 73d Cong., 2d Sess., Feb. 27, 1934, contained a provision (section 215) which if enacted would have given the Commission comprehensive authority over transactions between common carriers and their affiliates. The provision was deleted because AT&T "was insistent that it would wreck the telephone company's business and make it impossible for the company to do business, and painted a very black picture." 78 Cong.Rec. 8824 (1934) (remarks of Senator Dill). No doubt AT&T was concerned that the FCC might interfere with the web of contracts that made the Long Lines Division, Western Electric, Bell Laboratories, and the Bell operating companies a single entity for providing telephone service and equipment nationwide. In place of the stricken provision the Commission was directed to investigate affiliate relationships and report back to Congress. See id.; 47 U.S.C. Sec. 215. But the provision of H.R. 8301 that required parent companies to file annual reports with the Commission in the form prescribed by the Commission (section 219) survived, only with a change from "parent or subsidiary of" to "persons directly or indirectly controlling or controlled by," which if not just a change of form rather than substance expands rather than contracts the Commission's authority. This is all the relevant legislative history that we have found.
 
 
 32
 Having been denied comprehensive authority over holding companies, the Commission could not (we may assume without having to decide) adopt a blanket rule requiring the regional companies to submit their capitalization plans to the Commission for approval. But this is not what the Commission did. It commanded the submission of such plans by companies that have both telephone and equipment subsidiaries, and it proposes to limit its scrutiny of the plans to the respects in which they may affect the Commission's now indubitably lawful separate-subsidiary order. The limited power that the Commission has asserted falls (or so at least the Commission was entitled to conclude from an interpretation of the Communications Act to which we are bound by Chevron and the decisions cited there to give substantial deference) within the scope of a separate grant of power to the Commission. This is the necessary and proper clause, section 4(i), 47 U.S.C. Sec. 154(i), which authorizes the Commission to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." Section 4(i) empowers the Commission to deal with the unforeseen--even if it that means straying a little way beyond the apparent boundaries of the Act--to the extent necessary to regulate effectively those matters already within the boundaries.
 
 
 33
 Section 4(i) is not infinitely elastic. It could not properly be used to regulate an activity unrelated to the communications industry, as the court found the Commission had done in GTE Service Corp. v. FCC, 474 F.2d 724, 735-36 (2d Cir.1972) (data processing), or, as its language makes clear, to contravene another provision of the Act, see AT & T v. FCC, 487 F.2d 865, 876-78 (2d Cir.1973). So if the Communications Act said, "hands off holding companies," section 4(i) would not save the present order. But the Act does not say that; it just does not grant the Commission comprehensive power over holding companies, and that is not the power that the Commission is claiming here. The power asserted here is less far-reaching than the power the Commission has been allowed to exercise under its implied "ancillary jurisdiction" to regulate services such as cable television that impinge on the services over which it has explicit statutory jurisdiction. See, e.g., United States v. Southwestern Cable Co., 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968).
 
 
 34
 The only real question is whether the Commission could reasonably conclude that requiring the regional companies to submit plans of capitalization for the Commission's approval was necessary and proper to the effectuation of the separate-subsidiary order. The regional companies combine telephone companies with unregulated operations such as the sale of customer premises equipment, but the equipment subsidiary must be financed separately from the telephone company. Suppose that a regional company uses its retained earnings to finance an expansion of its equipment subsidiary. If those earnings were generated disproportionately by the profits of the telephone subsidiary, it would mean that the telephone subsidiary was subsidizing the equipment subsidiary in violation of the separate-subsidiary order. The Commission wants to prevent this by inspecting the regional companies' capitalization plans to make sure that the equipment subsidiaries are not undercapitalized so that they do not become a drain on telephone-company revenues; and to disapprove any plan which creates a danger of this.
 
 
 35
 The petitioners point out that any retained earnings are their property. This is true, but weakens rather than strengthens their argument. Cf. Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R., 417 U.S. 703, 714-15, 94 S.Ct. 2578, 2584-85, 41 L.Ed.2d 418 (1974). The Commission has a legitimate interest in discovering whether the regional companies are using revenues from regulated telephone operations to support their unregulated equipment businesses. This would be an abuse of the holding company form that the Commission would have the duty to correct, and no lack of statutory power to do so. Both the telephone line and the equipment attached to that line are within its regulatory reach, see, e.g., Computer & Communications Industry Ass'n v. FCC, 693 F.2d 198, 213 (D.C.Cir.1982), and the Commission cannot be prevented from regulating within its proper domain by the creation of paper entities; it can pierce the corporate veil in order to prevent frustration of its regulatory tasks. This case is the opposite of Powell v. Washington Metropolitan Area Transit Comm'n, 485 F.2d 1080, 1084-85 (D.C.Cir.1973), where the regulatory agency was allowed to include retained earnings in the regulated firm's rate base in order to encourage the expansion of the regulated service.
 
 
 36
 Granted, the problem of subsidizing a regional company's equipment subsidiary out of profits made by its telephone company subsidiary would not exist if those profits were limited to the amount necessary to attract the necessary capital for its business, as they would be if federal and state regulation of telephone rates were fully effective; but it cannot be assumed to be fully effective. Granted, too, the danger of cross-subsidization under the conditions now prevailing in the telephone industry may well be remote. But that is not argued by the regional companies and in any event would be more pertinent to a challenge to the Commission's action in disapproving a particular capitalization plan than to a challenge to its power to require the submission of such plans.
 
 
 37
 The Commission could try to police compliance with the separate-subsidiary order directly, without worrying about the capital structure of each regional company. But it wants to intervene at an earlier stage, lest capital structure, once set, be hard to change. We cannot say that this is an unreasonable desire or one beyond the Commission's broad powers under section 4(i), and will not say that it is an unwise desire, as that is not our business.
 
 
 38
 We need not speculate on the possible grounds on which the Commission might disapprove a regional company's plan of capitalization; the Commission has yet to disapprove one. We also do not pass on the issue whether the Commission has the power to impose the particular sanctions it has threatened on regional companies that do not comply with the capitalization order. Now that the order has been upheld, we can assume the companies will comply. The issue of sanctions is premature.
 
 
 39
 AFFIRMED.