**ILLINOIS BELL TELEPHONE COMPANY, et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Bell Atlantic Telephone Companies, United States Telephone Association, North American Telecommunications Association, People of the State of California, et al., Mountain States Telephone and Telegraph Co., et al., International Communications Association, Independent Data Communications Manufacturers Association, Inc., New York Telephone Co., Pacific Bell and Nevada Bell, GTE Service Corporation, Southwestern Bell Telephone Co., Central Telephone Co., Intervenors.**

No. 88–1077.

United States Court of Appeals, District of Columbia Circuit.

Argued May 16, 1989.

Decided Aug. 1, 1989.

As Amended Aug. 1, 1989.

Alfred W. Whittaker, Richmond, Va., with whom Floyd S. Keene, Milwaukee, Wis., was on the brief, for petitioners.

Laurel R. Bergold, Atty., F.C.C., with whom Diane S. Killory, Daniel M. Armstrong, C. Grey Pash, Jr., Attys., F.C.C., Catherine G. O'Sullivan and Andrea Lim-

mer, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

Linda L. Oliver, Washington, D.C., and John E. Ingle, Attys., F.C.C., also entered appearances for respondents.

Albert H. Kramer and Denise Bonn, Washington, D.C., were on the brief for intervenor North American Telecommunications Ass'n.

Herbert E. Marks, James L. Casserly and David Alan Nall, Washington, D.C., were on the brief, for intervenor Independent Data Communications Manufacturers Ass'n, Inc.

James R. Young and Lawrence W. Katz entered appearances for intervenor Bell Atlantic Telephone Cos.

Martin T. McCue, Washington, D.C., entered an appearance, for intervenor U.S. Telephone Ass'n.

Janice E. Kerr, J. Calvin Simpson, San Francisco, Cal., and Ellen S. Levine entered appearances, for intervenor People of the State of Cal., et al.

Dana A. Rasmussen, Robert B. McKenna and Debra T. Yarbrough, Washington, D.C., entered appearances for Mountain States Tel. and Tel. Co., et al.

Brian R. Moir entered an appearance, for intervenor International Communications Ass'n.

Mary McDermott and Martin J. Silverman entered appearances for intervenor New York Telephone Co.

Robert A. Barada, Jeffrey B. Thomas, Cincinnati, Ohio, and Stanley J. Moore entered appearances for Pacific Bell and Nevada Bell.

Richard McKenna and Daniel L. Bart entered appearances for intervenor GTE Service Corp.

William C. Sullivan, Michael J. Zpevak and Liam S. Coonan, St. Louis, Mo., entered appearances for intervenor Southwestern Bell Telephone Co.

Theodore D. Frank, Washington, D.C., entered an appearance for Central Telephone Co.

Before MIKVA, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The Ameritech Operating Companies ("Ameritech" or "petitioners"), a commonly-owned association of five Bell Operating Companies ("BOCs") spun off pursuant to a settlement of an antitrust suit brought by the government against AT & T, *see United States v. AT & T*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), seek review of an order of the Federal Communications Commission. The order conditions the BOCs' marketing of customer premises equipment ("CPE") (other than through entirely separate CPE subsidiaries) on their agreement to provide "independent CPE vendors ... with a meaningful opportunity to market Centrex and other BOC network services through sales agency plans or other functionally equivalent means." *Furnishing of Customer Premises Equipment by the Bell Operating Companies and the Independent Telephone Companies*, 2 F.C.C. Rcd 143, 156 (1987) ("*BOC Structural Relief Order*"). Ameritech contends that the Commission has imposed these conditions arbitrarily and in contravention of statutory provisions reserving to the states the regulation of intrastate communications services. We deny the petitions.

## I.

### A.

Until 1980, the provision of most CPE by common carriers was subjected to rate regulation under Title II of the Communications Act of 1934, 47 U.S.C. §§ 201–224 (1982). In that year, however, the Commission instituted a major restructuring of its Title II regulatory program, removing from Title II coverage the provision of CPE and so-called "enhanced services" and reserving Title II regulation solely for the offering of "basic" transmission service.

*See Amendment of Section 64.702 of the Commission's Rules (Second Computer Inquiry)*, 77 F.C.C.2d 384 (1980) (*"Computer II"*), *recon.*, 84 F.C.C.2d 512 (*"Computer II Reconsideration"*), *further recon.*, 88 F.C.C.2d 512 (1981), *aff'd sub nom. Computer & Communications Industry Ass'n v. FCC*, 693 F.2d 198 (D.C.Cir.1982), *cert. denied*, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983).[1] The FCC believed deregulation of all but the basic service market would benefit consumers by enhancing customer choice and encouraging more efficient use of telecommunications networks. Sales of CPE and enhanced services were thereafter treated according to the Commission's "ancillary" jurisdiction under Title I of the Act, 47 U.S.C. §§ 151–158 (1982), which provides the Commission general authority over, *inter alia*, "all interstate and foreign communication by wire," 47 U.S.C. § 152(a) (1982), defined in the statute to include "all instrumentalities, facilities, [and] apparatus ... incidental to such [communication]." *Id.* § 153(a). In *Computer II*, the FCC exercised this ancillary jurisdiction to preempt the states from regulating the offering of CPE and enhanced services. Insofar as CPE was concerned, preemption of inconsistent state regulation was believed necessary in order to fulfill the federal deregulatory objective because CPE was used to support both interstate *and* intrastate communications. *See Computer II*, 77 F.C.C.2d at 455–57.

The Commission, however, conditioned the opportunity for common carriers to provide CPE and enhanced services on the carriers' agreement to keep separate accounts for their regulated and unregulated activities. *Id.* at 475–76. Special treatment was accorded AT & T and its then wholly-owned BOCs; because of their monopoly over access to telecommunications networks and the risk that they would use their monopoly power to gain leverage in the competitive CPE market, the Commission required these companies to form separate subsidiaries to market CPE and enhanced services. *Id.* at 477. The Commission, aware that these structural separation requirements were not without efficiency costs, believed that the benefits of separation in terms of protecting the health of the competitive CPE market would outweigh whatever costs separation entailed. After the breakup of AT & T, the Commission imposed substantially the same structural separation requirements on the divested BOCs, based on the notion that their near-monopoly power in offering network access would give them an unfair advantage in the markets for CPE and enhanced services. *See Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Enhanced Services and Cellular Communications Service by the Bell Operating Companies*, 95 F.C.C.2d 1117 (1983) (*"BOC Separate Subsidiary Order"*), *aff'd sub nom. Illinois Bell Telephone Co. v. FCC*, 740 F.2d 465 (7th Cir. 1984), *recon. denied*, 49 Fed.Reg. 26,056 (June 26, 1984), 56 Rad.Reg.2d (P & F) 581 (*"BOC Separate Subsidiary Reconsideration"*), *aff'd sub nom. North American Telecommunications Association v. FCC*, 772 F.2d 1282 (7th Cir.1985). The Commission's structural separation orders were affirmed in all respects on direct review. *See Computer & Communications Industry Ass'n v. FCC*, 693 F.2d 198 (D.C.Cir.1982) (affirming *Computer II*), *cert. denied*, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313; *Illinois Bell Telephone Co. v. FCC*, 740 F.2d 465 (7th Cir.1984) (affirming *BOC Separate Subsidiary Order*); *North American Telecommunications Ass'n v. FCC*, 772 F.2d 1282 (7th Cir.1985) (affirming *BOC Separate Subsidiary Reconsideration*).

Soon after "modified" separation requirements were imposed on the divested BOCs, a number of the BOCs, including Ameritech, petitioned the Commission to

---

**1.** Basic service provides the simple capability to transmit information over a communications network. It is distinguishable from an "enhanced service," which

> combine[s] basic service with computer processing applications that act on the format,

content, code, protocol or similar aspects of the subscriber's transmitted information, or provide the subscriber additional, different, or restructured information, or involve subscriber interaction with stored information. *Computer II*, 77 F.C.C.2d at 387.

allow their CPE subsidiaries to market CPE jointly with network services, and to permit the BOCs to pay their subsidiaries commissions on the network services portion of their sales. The BOCs required such authority, the Commission was told, because large telecommunication customers typically desired to purchase basic services, enhanced services, and CPE from a single vendor—the communications equivalent of "one-stop shopping." Unless the BOCs' CPE subsidiaries were permitted to engage in joint marketing, they would be unable to compete effectively with independent vendors (who were free to offer CPE-network service packages), and consumers would be deprived of meaningful choices as to communications packages. *See American Information Technologies Corp.*, 98 F.C.C.2d 943, 945, 951–52 (1984) (*"Sales Agency Order"*), *recon. denied*, 59 Rad. Reg.2d (P & F) 309 (1985) (*"Sales Agency Reconsideration"*).

The Commission found joint marketing to be "in the public interest," *id.* at 945, but recognized the "potential for anti-competitive abuse and cross-subsidy" inherent in such arrangements, *id.* at 953, including the possibility that the BOCs would use commission payments to their CPE subsidiaries as a means of "shift[ing] costs from unregulated activities to regulated services." *Id.* at 955. To ameliorate the FCC's concerns in this respect, Ameritech proposed to enter into "substantially similar marketing [and commission] agreements with a 'reasonably manageable' number of unaffiliated CPE vendors." *Id.* at 947 (quoting Ameritech petition). The Commission ultimately approved those arrangements, subject, *inter alia*, to the following conditions:

[E]ach BOC must allow a reasonable number of bona fide third party vendors to participate fully in these [sales agency marketing] plans, on a nondiscriminatory basis. Other vendors must be offered the opportunity to earn the same percentage commissions as the subsidiaries, and on the same terms and conditions.

*Id.* at 956 (footnote omitted). "Sales agency" arrangements with independent CPE vendors were thus introduced into the communications marketplace.

### B.

This dispute grows out of the Commission's eventual disenchantment with, and dismantling of, structural separation requirements. AT & T was the first to benefit from the FCC's new approach. In view of fundamental changes in the telecommunications marketplace, such as the elimination of AT & T's monopoly control of local exchange facilities, the decline in AT & T's long-distance market share, and the birth of vigorous competition in the CPE marketplace, the Commission concluded in 1985 that the "structural separation requirements for AT & T's CPE operations no longer provide benefits to the public that exceed their costs[.]" *Furnishing of Customer Premises Equipment and Enhanced Services by American Telephone and Telegraph Co.*, 102 F.C.C.2d, 627, 672 (1985) (*"AT & T Structural Relief Order"*), *recon.*, 104 F.C.C.2d 739 (1986). Structural separation requirements were therefore eliminated for AT & T and replaced by a series of "nonstructural safeguards," one of which required AT & T to establish an accounting procedure (subject to periodic independent audits) by which "joint and common costs between its regulated and unregulated operations" would be divided and assigned to those respective operations. *Id.* at 699; *see id.* at 681–99. These safeguards were imposed chiefly out of recognition that AT & T remained a "dominant carrier" in the industry, and retained "some ability to act anticompetitively in its CPE activities." *Id.* at 682.

Soon thereafter, Ameritech and others petitioned for the removal of structural separation requirements on the BOCs as well, and the Commission responded by instituting a rulemaking proposing to eliminate structural separation in favor of unspecified nonstructural safeguards. After receiving comments, the Commission concluded, as it had done earlier with respect to AT & T, that "the inefficiencies and other costs to the public associated with [ ] structural separation requirements substantially outweigh the corresponding ben-

efits." *Furnishing of Customer Premises Equipment by the Bell Operating Telephone Companies and the Independent Telephone Companies,* 2 F.C.C.Rcd 143, 144 (1987) (*"BOC Structural Relief Order"*). But because the Commission believed that the potential for anticompetitive conduct by the BOCs was even greater than that presented by AT & T, the nonstructural safeguards ultimately crafted for the BOCs differed in significant respects from those imposed on AT & T. While the BOCs, like AT & T, were required to allocate joint and common costs between regulated and unregulated operations in accordance with cost allocation rules to be formulated by the FCC in the near future,[2] the FCC also required the BOCs "to provide independent CPE vendors with a meaningful opportunity to market their CPE jointly with Centrex and other BOC network services." 2 F.C.C.Rcd at 156. By so doing, the FCC in effect conditioned the BOCs' relief from structural separation on the BOCs' agreement to maintain the "sales agency plans," or other "functionally equivalent" programs, developed in the Commission's *Sales Agency Order. Id.* The BOCs would thus continue to be obliged to pay commissions to a reasonable number of independent CPE vendors for their sales of network services in conjunction with CPE.[3] In addition, the Commission preempted the states from imposing structural separation requirements, or any other regulations inconsistent with the FCC's nonstructural safeguards, on the BOCs' marketing of CPE. The Commission found the jurisdictional premises of *Computer II* and its *BOC Separate Subsidiary Order* squarely applicable, concluding "that there [was] no practical way to divide the subject matter of [its] regulatory program into separate interstate and intrastate components." 2 F.C.C.Rcd at 160.

Ameritech, the only BOC parent seeking review of this order, argues that the economic and legal basis for imposing sales agency requirements has eroded, and in any event that the function performed by sales agency has been entirely supplanted by requiring the BOCs to observe the *Joint Cost Order.* Petitioners therefore contend that the sales agency requirement imposed as a condition to structural relief is arbitrary and capricious. Alternatively, it is contended that the Commission is without authority under the Communications Act to regulate the marketing of such purely *intrastate* services as Centrex. We take up the administrative law challenge first because we think its discussion illuminates the jurisdictional question.

## II.

■ We must accord the FCC substantial deference in testing the rationality of its imposition of sales agency requirements on the BOCs as a condition to relief from structural separation. *See Western Union Int'l, Inc. v. FCC,* 804 F.2d 1280, 1292

---

2. These "joint cost" rules were finalized in 1987. *See Separation of Costs of Regulated Telephone Services from Costs of Nonregulated Activities,* 2 F.C.C. Rcd 1298 (1987) (*"Joint Cost Order"*), *recon.* 3 F.C.C. Rcd 6283 (1987), *further recon.,* 53 Fed.Reg. 49, 320 (Dec. 7, 1988), *petitions for review pending sub nom. Southwestern Bell Corp. v. FCC,* No. 87–1764 (D.C.Cir. filed Dec. 14, 1987); *National Tel. Cooperative Ass'n v. FCC,* No. 87–1771 (D.C.Cir. filed Dec. 15, 1987). The other nonstructural safeguards more or less commonly imposed on AT & T and the BOCs (1) required the carriers to disclose to the public certain technical information concerning planned changes in network services, in advance of their implementation, that might affect the interconnection of CPE, *AT & T Structural Relief Order,* 2 F.C.C. Rcd at 150–51; (2) regulated the carriers' use of "customer proprietary network information," 102 F.C.C.2d at 693–94; 2 F.C.C. Rcd at 152–53; and (3) prohibited the

carriers from discriminating against network customers whose CPE was supplied by independent vendors. 102 F.C.C.2d at 690–91; 2 F.C.C. Rcd at 155.

3. Contemporaneously, the Commission did away with structural separation with respect to the provision of enhanced services by AT & T and the BOCs, and imposed in its stead nonstructural safeguards similar to those under review here. *Amendment of Section 64.702 of the Commission's Rules and Regulations,* 104 F.C. C.2d 958 (1986), *recon.,* 2 F.C.C. Rcd 3035 (1987), *petition for review pending sub nom. People of the State of California v. FCC,* No. 87–7230 (9th Cir. filed May 28, 1987), *further recon.,* 3 F.C.C. Rcd 1135 (1988), *petition for review pending sub nom. Illinois Bell Tel. Co. v. FCC,* No. 88–1364 (D.C.Cir. filed May 16, 1988).

(D.C.Cir.1986); *see also FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981). Only if it appears that the Commission has abused its discretion in striking a balance between competing statutory concerns is judicial intervention appropriate. *See Computer & Communications Indus. Ass'n*, 693 F.2d at 218–19. We think the FCC's order survives review under this deferential standard.

Petitioners devote a substantial portion of their principal brief to the question of whether there exists any need at all for sales agency programs in the post-*Joint Cost Order* environment. Petitioners deny that there is any such enduring need, citing the Commission's own conclusion in the *BOC Structural Relief Order* that the *Joint Cost* proceeding "will enable [the] Commission to detect and remedy any attempts by the BOCs to shift costs properly attributable to unregulated operations to their regulated activities through the improper allocation of joint and common costs or the improper pricing of transactions between their regulated operations and nonregulated affiliates. . . ." *BOC Structural Relief Order*, 2 F.C.C.Rcd at 147. These joint cost rules have since been completed, fulfilling the Commission's original design. The FCC, moreover, does not dispute that the BOCs' service-specific sales commissions on the one hand, and the cost allocations developed in the *Joint Cost* proceeding on the other, cannot meaningfully be compared given the absence of a common base between them. Ameritech thus disputes as disingenuous the Commission's expressed belief that sales agency commissions can serve as a "useful benchmark for assessing the reasonableness of a BOC's allocation of marketing and related expenses of providing CPE ... on an integrated basis." *BOC Structural Relief Order*, 2 F.C.C.Rcd at 156.

The Commission's "benchmark" rationale does appear thin. The FCC opinions provide no explanation as to the mechanics of comparing two sets of data—service-specific sales commissions and aggregate, non-service-specific marketing costs—asserted by Ameritech to be incomparable by their nature, and the FCC's brief, as we have said, does not assert their comparability either. "[T]he Commission must do more than simply ignore comments that challenge its assumptions and must come forward with some explanation that its view is based on some reasonable analysis." *ALLTEL Corp. v. FCC*, 838 F.2d 551, 558 (D.C.Cir.1988). While we might conceive of ways of using the underlying data in a fashion that would permit a representative comparison, this task is the Commission's and not the court's. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Accordingly, were the "benchmark" theory the only basis on which the Commission rested its decision to impose sales agency requirements (or their functional equivalent) as a condition to structural relief, Ameritech's challenge to the rationality *vel non* of sales agency would be troublesome.

This is not the case. In both its original opinion and its opinion on reconsideration, the Commission advanced a second basis for its sales agency requirement that is both rational and adequately explained— that BOC sales agency programs will help ensure vigorous and fair competition in the all-important CPE marketplace. *See BOC Structural Relief Order*, 2 F.C.C.Rcd at 156; *BOC Structural Relief Reconsideration*, 3 F.C.C.Rcd at 27. And this rationale is quite distinct from concerns about cross-subsidization of unregulated with regulated activities. Because evidence presented to the FCC indicated that the BOCs continue to exercise monopoly control over local "bottleneck facilities," 2 F.C.C.Rcd at 155, the Commission believed that "the BOCs' unseparated provision of CPE raises greater anticompetitive concerns than such provision by AT & T." *Id.* at 156. Retention of a sales agency requirement, in the Commission's view, would help address these concerns by, among other things, leveling the competitive playing field:

> First, this requirement will enable independent CPE vendors an opportunity to provide customers with an integrated CPE/network services package on an ef-

ficient basis. Second, the ability of independent CPE vendors to offer such 'one-stop shopping' will provide competition for the BOC's own CPE operations and/or the BOCs' network sales departments. Third, independent CPE vendors might provide integrated services to CPE customers that the BOCs choose not to serve.

2 F.C.C.Rcd at 156; *see also* 3 F.C.C.Rcd at 27.

The economic basis for imposing the sales agency requirement seems to us to be indisputable. Because telecommunications consumers typically demand CPE and network services at the same time (indeed, the BOCs emphasized this marketing reality in support of their petition for structural relief, *see BOC Structural Relief Order*, 2 F.C.C.Rcd at 156), any firm that hopes to compete in the CPE market must combine its equipment offerings with network services in a marketable package. But the addition of network services—such as Centrex, for instance [4]—to a CPE firm's marketing portfolio is not without incremental cost. A CPE firm that hopes to induce a customer to opt for its equipment is put to the time and expense of assisting the customer in selecting and confirming compatible network services as well. Whereas BOCs will be able to transfer—under the *Joint Cost Order*—a portion of these joint marketing costs (attributable to the sale of network services) to consumers through regulated tariffs, independent vendors do not have this opportunity. Without receiving the commissions for marketing Centrex and other network services that will flow as a result of the Commission's sales agency requirement, independent CPE vendors, therefore, would be forced to incorporate the full incremental cost of marketing network services into their prices for CPE. This would leave independent vendors at a distinct disadvantage in their head-to-head

rivalry with the BOCs, and might threaten long-term CPE competition.

By requiring the BOCs to place a reasonable number of independent CPE vendors on a comparable footing to that enjoyed by the BOCs in the CPE market, the Commission believes that competition in the CPE marketplace will be enhanced. We think this economic view reasonable and thus entitled to deference. *See Western Union Int'l, Inc.*, 804 F.2d at 1292. To be sure, as petitioners insist, CPE vendors are entitled—apart from participation in sales agency programs—to "act as agents for their customers [and] order basic services to meet their customers' [continued CPE/network service] needs ...," *Sales Agency Order*, 98 F.C.C.2d at 952, and to that extent they are not *disabled* from offering their CPE products in conjunction with network services in the same fashion the BOCs do. Legally qualifying them to sell, however, is not equivalent to providing them with a relatively equal economic opportunity to compete, and petitioners ignore this crucial distinction.

Paradoxically, petitioners argue that the *limited* scope of the sales agency plans approved by the Commission staff to date suggests the ineffectiveness—and thus the irrationality—of the sales agency requirement. Petitioners point to a recent order by the Common Carrier Bureau approving sales agency programs that include only small numbers of independent CPE vendors and cover only a limited range of network services, chiefly Centrex. *See Furnishing of Bell Operating Telephone Companies and the Independent Telephone Companies*, 3 F.C.C.Rcd 412, 421 (1987). We are told that if the FCC had truly been inspired to impose sales agency requirements by the threat of unfair BOC competition in the CPE marketplace, the FCC would not have "refused to direct the

---

**4.** Centrex[ ] is a tariffed service sold by local phone companies. It offers such telecommunications functions as intercom calling, conference calling, direct inward dialing, and automatically identified outward dialing.... These electronic switching services are performed at the exchange carrier's central office switch, and have traditionally been offered

principally to large organizations and government agencies as an alternative to purchasing or leasing a private branch exchange ("PBX"), which is a smaller switch located on the subscriber's premises used to provide the same services.
*National Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1122 (D.C.Cir.1984).

BOCs to expand the coverage of their sales agency programs [beyond Centrex] to include all network services" and all independent CPE vendors, even though that course would be even more unattractive to the BOCs.

The Commission's order admittedly provides little guidance as to the number of independent vendors or the range of network services required to be included in BOC joint marketing plans. It states simply that the plans submitted must provide "independent CPE vendors ... with a meaningful opportunity to market Centrex and *other* BOC network services...." *BOC Structural Relief Order*, 2 F.C.C.Rcd at 156 (emphasis added). But the Commission has not yet had an opportunity to consider objections raised as to the scope of the programs approved by the Bureau, and thus we think it premature to consider that question. We simply do not know whether the Commission will, contrary to the Common Carrier Bureau, insist that sales agency agreements include compensation for provision of network services that extend beyond Centrex. Indeed, intervenor Independent Data Communications Manufacturers Association has argued that the Commission, in order to render those agreements meaningful, should overrule the Bureau. That issue, it seems quite clear, is not yet properly before us. *See, e.g., American Fed'n of Gov't Employees v. Horner*, 821 F.2d 761, 766–68 (D.C.Cir. 1987). We may now consider only petitioners' challenge to the FCC order, and that order speaks of Centrex *and* other BOC network services.

Petitioners do make one point about the scope of the *BOC Structural Relief Order* that is ripe for review—that it was irrational and unfair for the Commission to impose sales agency requirements, whatever their scope, on the BOCs but not on AT & T and the independent telephone companies. We think the Commission's basis for distinguishing AT & T—that it no longer controls local "bottleneck" facilities—was adequately explained, *see BOC Structural Relief Order*, 2 F.C.C.Rcd at 155–56, but the Commission's justification for more lenient treatment for the independents is somewhat cryptic. Like the BOCs, General Telephone & Electronics Co. ("GTE") and the other independents *do* control such "bottleneck" facilities in certain localities, making the risk of anticompetitive activity by those companies in the CPE market quite real. The Commission explains that the independents will be unable to discourage entry into the CPE market by independent CPE vendors "because each of the carrier's individual service areas is too small for possible discriminatory conduct." *Id.* at 158. It is not obvious that this observation is directly germane to what we understand to be the Commission's primary rationale for imposing sales agency requirements on the BOCs—to place independent CPE vendors on a competitive footing comparable to that enjoyed by the "bottleneck" carriers *within their geographic monopolies*. The Commission's assurance that "customers of [the independents], unlike customers of the BOCs with large service areas, will have readily available alternative CPE sources nearby and within the [independents'] service area[s]" ostensibly is in tension with the Commission's thesis underlying its imposition of sales agency requirements on the BOCs. For if one accepts this thesis, it is at least arguable that the "alternative CPE sources" doing business in the vicinity of the independents' service areas would not be able to compete effectively against the independents *within* those service areas.[5]

---

**5.** The Seventh Circuit Court of Appeals, in its review of the Commission's determination in the *BOC Separate Subsidiary Order* not to impose structural separation requirements on GTE and the other independents, found a nearly identical Commission rationale "not fully persuasive." *Illinois Bell Tel. Co. v. FCC*, 740 F.2d 465, 476 (7th Cir.1984). The court declined to upset the Commission's order, however, believing that the Commission's rush to impose structural separation requirements on the BOCs was driven by the timing of the AT & T divestiture decree. The court surmised that "[t]he Commission still may order GTE and perhaps others to form separate subsidiaries if they want to continue marketing customer equipment. It just has not got around to that yet, and in the circumstances, it did not have to." *Illinois Bell Tel. Co.*, 740 F.2d at 476.

We take the Commission to mean, however, that the risk of monopoly abuses within the independent telephone companies' service areas is different in degree, if not in kind, and, therefore, the imposition of sales agency requirements on the independents would not offer the same consumer returns as they would with respect to the BOCs. The monopoly service areas controlled by GTE and the other independents, the Commission observed, are relatively small and highly fractionalized, unlike the "BOC service areas [which] are concentrated in single, contiguous geographical regions." *BOC Structural Relief Order*, 2 F.C.C.Rcd at 158.[6] If any of the independents attempts to exploit its service customers' preference for "one-stop" purchases of equipment and services by increasing its profit margin on equipment sales, those customers can easily obtain CPE separately (if from no other CPE provider) from the BOC whose network access monopoly envelops the independent's service area. This is so because market information (in the form of advertising) concerning CPE sold in the surrounding BOC's service area will more than likely be available to the customers of the independents as well.

The Commission offered a second basis for distinguishing the BOCs and the independents which, although not without its difficulties, is also persuasive. The Commission stated that it had decided to impose sales agency requirements on the BOCs primarily out of concern over competition in the highly lucrative market for *business* CPE. The only network service specifically identified in the Commission's order, in fact, was Centrex, a business service. Because the network access monopolies controlled by the independents are predominantly located in rural and suburban areas where business equipment sales are minimal, the Commission thought the case for burdening the independents with sales agency requirements was less compelling.

*See BOC Structural Relief Order*, 2 F.C.C.Rcd at 158. On its face, this observation, unchallenged by petitioners, provides an additional basis for distinguishing between the BOCs and the independents.

We note, finally, that the Commission's preemption order leaves the states with authority to impose more restrictive nonstructural safeguards on the independents than the Commission has imposed on those companies, provided they "are no more stringent than those [the FCC] developed for the BOCs. . . ." *Id.* at 162. For those discrete situations which are "believe[d] [to] raise anticompetitive difficulties" within their jurisdictions, states have not been disabled at least from equalizing the regulatory burden of nonstructural safeguards between the BOCs and the independents. *See* 2 F.C.C.Rcd at 158 n. 250. On balance then, we do not perceive the distinction drawn by the Commission between the BOCs and the independents as arbitrary and capricious.

### III.

■ We turn to the preemption issue. Petitioners dispute the Commission's authority under the Communications Act to regulate the marketing of what they call purely "intrastate" services such as Centrex. Section 2(b) of the Act, in petitioners' view, reserves to the states exclusive jurisdiction over "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service," 47 U.S.C. § 152(b) (1982), and precludes the Commission from preempting state regulation of the marketing of Centrex. The sales agency requirement, petitioners argue, compels the BOCs to incur incremental marketing costs (through the payment of sales commissions to independent CPE vendors) in connection with the sale of "intrastate" Centrex Services. And because the requirement will surely "af-

---

6. The Commission acknowledged that not all of GTE's service areas are small relative to the BOCs'. In particular, the FCC noted that GTE controls the entire State of Hawaii as well as large urban areas in Tampa and Los Angeles. *See BOC Structural Relief Order*, 2 F.C.C. Rcd at 158. Since petitioners did not raise this possible anomaly, we will let it pass.

fect" charges for intrastate communications services, petitioners reason that the requirement exceeds limits of the Commission's jurisdiction under section 2(b).

The resolution of this question is guided in large measure by the Supreme Court's decision in *Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (*"Louisiana PSC"*). In *Louisiana PSC*, the Supreme Court invalidated an FCC attempt to preempt the states from imposing their own rules governing the calculation of depreciation expense for purposes of intrastate ratemaking. The FCC, in an effort to encourage common carriers to modernize their plant and equipment, had issued a series of orders permitting telephone companies to recover more accurately—and in some cases more rapidly—their investment in communications facilities in interstate ratemaking. In part to prevent frustration of this federal regulatory objective, the FCC preempted the states from imposing, in the course of intrastate ratemaking proceedings, inconsistent "depreciation rate prescriptions that do not adequately provide for capital recovery in the competitive environment." *Id.* at 363, 106 S.Ct. at 1895 (quoting *Amendment of Part 31 of the Commission's Rules and Regulations*, 92 F.C.C.2d 864, 876 (1983)). The Court held that section 2(b) "constitute[d] ... a Congressional *denial* of power to the FCC to require state commissions to follow FCC depreciation practices for intrastate ratemaking purposes." *Id.* at 374, 106 S.Ct. at 1901. Only "where it [is] *not* possible to separate the interstate and intrastate components" of the subject matter is the exercise of plenary federal jurisdiction (and preemption of conflicting state regulation) permissible. *Id.* at 375 n. 4, 106 S.Ct. at 1902 n. 4 (citing *North Carolina Utils. Comm'n v. FCC*, 537 F.2d 787 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976), and *North Carolina*

*Utils. Comm'n v. FCC*, 552 F.2d 1036 (4th Cir.), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977)). Applying these principles to the case before it, the Court held the FCC's preemption of state depreciation rules unlawful. In the Court's view, the jurisdictional "separations process" set forth in the Act, *see* 47 U.S.C. §§ 221(c), 410(c) (1982), provided a workable mechanism to allocate plant and equipment costs between interstate and intrastate service. *Id.* at 375.

Ameritech contends that *Louisiana PSC* insulates from the Commission's reach services of a purely intrastate character like Centrex. But Centrex is not the sort of exclusively intrastate service that petitioners suggest.[7] As the Commission noted below, "Centrex supports both interstate and intrastate communications.... [I]nterstate access is ... an integral part of the [Centrex] offering[.]" *BOC Structural Relief Order*, 2 F.C.C. Rcd at 160. Indeed, consumers enjoy a statutory right to such interstate access, a right that is distinctly *federal* in character. *See* 47 U.S.C. § 201(a) ("It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor"); *see also Hush–a–Phone Corp. v. United States*, 238 F.2d 266, 269 (D.C.Cir.1956). Consumers pay for this access through federally-regulated access charges whenever they subscribe to local exchange services, including Centrex. Counsel for petitioner conceded at oral argument this crucial interstate aspect of Centrex and similar services when he agreed that the Commission could lawfully prevent the states from prohibiting the offering of Centrex service by common carriers. This could be true *only* if a federal right of access to the interstate communications network was, in fact, implicated in the provision of Centrex. We think it is.

7. Even if Centrex were a purely intrastate service, the FCC might well have authority to preemptively regulate its marketing if—as would appear here—it was typically sold in a package with interstate services. Marketing realities might themselves create inseparability. *See infra* p. 116.

To be sure, the Commission has on past occasions stated that the *costs* associated with the marketing of Centrex "are attributable to 'local' billings and [ ] assign[able] [exclusively] to [ ] intrastate operations," *Sales Agency Reconsideration*, 59 Rad. Reg. 2d (P & F) at 319; *see also North American Telecomm. Ass'n v. Mountain States Tel. & Tel. Co.*, 60 Rad.Reg.2d (P & F) 1355, 1362 (1986); *Sales Agency Order*, 98 F.C.C.2d at 956. But this regulatory accounting treatment does not negate the mixed interstate-intrastate character of services like Centrex. We note the categorical nature of the Commission's prior statements has been modified in more recent jurisdictional separations proceedings in which the Commission has determined, on an interim basis, to permit allocation of marketing expenses pooled by local exchange carriers on the basis of intrastate and interstate billings. *See Amendment of Part 67 (New Part 36) of the Commission's Rules and Establishment of a Joint Board*, 2 F.C.C. Rcd 5349, 5353 (1987); *see also* 47 C.F.R. § 36.372 (1988). Because Centrex billings include interstate access charges, *see National Ass'n of Regulatory Util. Comm'rs*, 737 F.2d at 1113–15, the Commission's interim treatment of Centrex marketing expenses would seem to permit a pass-through of a portion of these expenses to the interstate jurisdiction.[8] However, since the treatment of Centrex marketing costs played no part in the proceeding under review, we think it inappropriate—and unnecessary—to offer a view on the question. Whether or not the mixed character of these services permits the FCC to assign some portion of their associated marketing costs to the interstate jurisdiction for recovery through interstate tariffs is a separate question to be resolved in jurisdictional separations proceedings.[9] The resolution of that issue is not determinative of the case before us, because we think it undeniably true that Centrex and other local exchange services, much like customer telephone equipment, *see, e.g., North Carolina Utils. Comm'n v. FCC*, 537 F.2d 787, 794 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976), support interstate as well as intrastate communications.

As the FCC concedes, however, the fact that Centrex and like services support interstate as well as intrastate communications does not necessarily authorize preemptive federal regulation of the intrastate aspects of those services. Section 2(b) of the Act, the Supreme Court has held, "fences off from FCC reach or regulation intrastate matters ..., including matters 'in connection with' intrastate services." *Louisiana PSC*, 476 U.S. at 370, 106 S.Ct. at 1899. But, as the parties agree, "where it [is] *not* possible to separate the interstate and the intrastate components of the [ ] FCC regulation" involved,

---

**8.** Simultaneously with issuing its interim guidance, the Commission designated a Joint Federal–State Board to recommend permanent allocation rules for marketing expenses. *See Amendment of Part 67 (New Part 36) of the Commission's Rules and Establishment of a Joint Board*, 2 F.C.C. Rcd at 5353. The Joint Board, we note, seems headed in the direction suggested by the Commission's previous statements regarding the allocation of Centrex commissions, *see, e.g., Sales Agency Reconsideration*, 59 Rad. Reg. 2d (P & F) at 319, for it has recently proposed that local exchange carriers be required to assign expenses incurred in marketing services such as Centrex exclusively to the intrastate jurisdiction. *See Amendment of Part 36 of the Commission's Rules and Establishment of a Joint Board*, 3 F.C.C. Rcd 2774, 2778 (1988). Nevertheless, this is a recommendation only, and is subject to plenary review before the Commission. *See id.*

**9.** Petitioners claim that if Centrex marketing truly involves interstate as well as intrastate activity, the FCC is obliged to assign some portion of the commissions paid by the BOCs to independent vendors to the interstate rate base. They rely on *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 148–51, 51 S.Ct. 65, 68–70, 75 L.Ed. 255 (1930), the landmark case in which the Supreme Court held that maintenance of the proper division of regulatory power between state and federal communications authorities requires estimation of the value of property used to provide intrastate and interstate services, respectively. *Id.* at 148–51, 51 S.Ct. at 68–70. Such an allocation of exchange plant between intrastate and interstate jurisdictions, according to the Court, ensures the confinement of conflicting regulatory tribunals to their proper spheres. *Id.* at 148, 51 S.Ct. at 68. We express no view on this perplexing question, leaving it for resolution in ongoing separations proceedings.

*id.* at 375 n. 4, 106 S.Ct. at 1902 n. 4, the Act sanctions federal regulation of the entire subject matter (which may include preemption of inconsistent state regulation) if necessary to fulfill a valid federal regulatory objective. *See, e.g., North Carolina Utils. Comm'n v. FCC,* 552 F.2d 1036 (4th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977); *North Carolina Utils. Comm'n v. FCC,* 537 F.2d 787 (4th Cir.), *cert. denied,* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976). We had occasion to apply this principle recently in *National Ass'n of Reg. Util. Comm'rs v. FCC,* 880 F.2d 422 (D.C.Cir.1989). There, we reviewed an FCC determination to give preemptive effect to an order "detariffing" the provision of telephone wiring within customer premises. We stated that the Communications Act permits FCC preemption of "a state's authority over intrastate telephone service ... when the states' exercise of that authority negates the exercise by the FCC of its own lawful authority over interstate communications." *Id.,* 880 F.2d at 429. Because the Commission had not convincingly explained how state inside wiring tariffs would necessarily "thwart [the FCC's legitimate objective] of a free and competitive inside wiring market," we remanded the preemption order to the Commission for further development of its jurisdictional rationale. *Id.,* 880 F.2d at 430.

In this case, however, we think the Commission has adequately explained its preemption order. No one questions the legitimacy of the FCC's stated objective of promoting competition in the CPE market both by proscribing the unfair advantage BOCs might gain in that market through their near-monopoly power in regulated markets and by attempting to minimize the efficiency costs on BOCs of any safeguards imposed. And the package of nonstructural safeguards the Commission has rationally chosen to fulfill this objective—including regulation of the manner in which Centrex and like network services are marketed jointly with CPE—does not appear capable of severance into discrete interstate and intrastate components. Petitioners admit that "the jurisdictional inseverability rationale is valid with respect to the nonstructural safeguards commonly applied to both AT & T and the BOCs." It is not apparent why the in severability analysis would logically differ with respect to sales agency requirements.

A similar problem confronted the Commission when it asserted exclusive jurisdiction over the terms and conditions under which consumers could connect consumer-provided CPE to the telecommunications network. The Commission had earlier concluded that AT & T's prohibition of the interconnection of consumer-provided CPE to the telecommunications network was invalid under the Act, *see Carterphone v. AT & T,* 13 F.C.C.2d 420, *recon. denied,* 14 F.C.C.2d 571 (1968). Thereafter a conflict between state and federal authorities over interconnection terms surfaced when the North Carolina Utilities Commission proposed to prohibit the connection of customer-provided equipment to any network except those used exclusively for interstate communications. The FCC determined that North Carolina's proposal and others like it were preempted by federal regulations. The Fourth Circuit upheld the Commission's jurisdiction over interconnection terms for both interstate and intrastate communications, reasoning that section 2(b) of the Act does not deprive the Commission of control over facilities used interchangeably for intrastate and interstate calls. *North Carolina Utils. Comm'n v. FCC,* 537 F.2d at 794. *See also North Carolina Utils. Comm'n v. FCC,* 552 F.2d 1036 (4th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977). As noted above, these decisions were subsequently explained (and implicitly approved) by the Supreme Court in *Louisiana PSC,* 476 U.S. 355, 375 n. 4, 106 S.Ct. 1890, 1902 n. 4, 90 L.Ed.2d 369, as involving circumstances where "it was *not* possible to separate the interstate and intrastate components of the asserted FCC regulation."

The Supreme Court's explanation of the interconnection decisions was, it appears,

informed by its recognition that strict separation of state and federal regulatory spheres in some settings would require construction of wholly independent intrastate and interstate networks and facilities, a result which seems at odds with Congress' intent. *See, e.g.,* 47 U.S.C. § 221(b) (1982) (dividing jurisdiction over multistate local exchanges used for both interstate and intrastate communication). The same type of consideration bears on our analysis here; we agree with the Commission "that there [is] no practical way to divide the subject matter of [its] regulatory program[,]" *BOC Structural Relief Order,* 2 F.C.C. Rcd at 150, for federal regulation of the manner in which the *interstate* aspects of Centrex are marketed jointly with CPE cannot exist simultaneously with state regulation of the joint marketing of CPE and the *intrastate* component of Centrex.

We think the Commission legitimately determined that inconsistent state regulation of joint CPE/service marketing would negate the valid federal goals of the order under review. *Louisiana PSC,* 476 U.S. at 375 n. 4, 106 S.Ct. at 1902 n. 4. Since the intrastate and interstate elements of Centrex and like services cannot be severed into discrete packages so as to permit separate state and federal regulation of the manner in which these services are marketed jointly with CPE, we conclude that the Act permits the Commission to assert plenary jurisdiction over such marketing practices in service of a valid interstate objective, even to the point of preempting conflicting state regulations.

Petitioners complain that the BOCs may be subject to a jurisdictional "whipsaw" if state public utility commissions, which presumably retain control over the recoverability of Centrex sales commissions for intrastate ratemaking purposes, exclude these commissions from the intrastate rate base. *See Sales Agency Order,* 98 F.C.C. 2d at 956 ("state regulatory commissions [may] prohibit payment of any commissions" for sales of basic services). Assuming *arguendo* the relevance of this point, we do not understand why the challenged order makes a jurisdictional "whipsaw" any more likely than before. Under the structural separation regime, BOCs had the power to avoid payment of any commissions to independent CPE vendors by declining to pay commissions to their CPE subsidiaries. The *BOC Structural Relief Order* similarly permits BOCs to avoid the "whipsaw" they fear; implementation of a joint marketing program is simply a *precondition* to structural relief, and BOCs are entitled to continue to operate their CPE subsidiaries separately and decline to pay commissions at all if they believe state utilities commissions will not recognize the marketing commissions in intrastate ratemaking. We do not find the character of the Commission's regulatory program to have changed substantially in this respect.

Accordingly, the petitions for review are *Denied.*